U.S. COURTS
MAY 27 2026
Rcvd_____ Filed_____ Time_____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

---

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

Klairessa May,

Plaintiff,

v.

Lance Stevenson, Dennis M. Charney, Dustin Bourne, Lendon Moss,Veronica Fierro, County of Minidoka

Defendants.

Civil Action No. ________

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

JURY TRIAL DEMANDED

Plaintiff alleges as follows:

**INTRODUCTION**

1. This is a civil rights action under 42 U.S.C. § 1983 arising from Defendants' misuse of privileged legal materials, fabrication of evidence, and coercion of a jailhouse informant to falsely implicate Plaintiff in criminal activity.

2. Acting under color of state law, Defendants used unlawfully obtained and fabricated evidence to initiate and pursue criminal charges against Plaintiff, causing her arrest, wrongful incarceration, and severe emotional, economic, and reputational harm.

3. Defendant County of Minidoka, through its final policymakers and customs, failed to properly train and supervise prosecutors and law enforcement officers regarding the use of

privileged materials, jailhouse informants, and exculpatory evidence, thereby enabling and ratifying the misconduct at issue.

4. Plaintiff seeks compensatory and punitive damages, declaratory and injunctive relief, and attorneys' fees and costs for the violations of her rights under the Fourth, Sixth, and Fourteenth Amendments.

## I. JURISDICTION AND VENUE

1. This action arises under 42 U.S.C. § 1983 to redress violations of Plaintiff's constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

2. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3. At all relevant times, each individual Defendant acted under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of Idaho and its political subdivisions.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all events giving rise to this claim occurred in Minidoka County, Idaho. With references to events occurring in Blaine and Lincoln County.

## II. PARTIES

1. Plaintiff Klairessa May is an individual who was investigated, prosecuted, and subjected to the conduct described in this Complaint.

2. Defendant Lance Stevenson was, at all relevant times, a prosecutor involved in the investigation and charging decisions in this matter.

3. Defendant Dennis M. Charney was, at all relevant times, a prosecutor involved in the prosecution of this matter.

4. Defendant Dustin Bourne was, at all relevant times, a law enforcement officer involved in the investigation, preservation requests, witness coordination, evidence handling, or related conduct.

5. Defendant Lendon Moss was, at all relevant times, a law enforcement officer involved in the investigation, preservation requests, witness coordination, and evidence handling, or related conduct.

6. Veronica Fierro was, at all relevant times, a law enforcement officer involved in the investigation, preservation requests, witness coordination, evidence handling, or related conduct.

7. Defendant County of Minidoka, Idaho is a political subdivision responsible for the policies, practices, training, and supervision of its prosecutors and law enforcement officers.

**III. GENERAL ALLEGATIONS**

1. The Plaintiff alleges that law enforcement and the prosecution advanced a theory of culpability that relied on selective acceptance of certain witness statements and alleged associations between the Plaintiff and the defendant, while disregarding or failing to apply equivalent scrutiny to the Plaintiff's own account. See *United States v. Di Re* (1948).

2. The Plaintiff further contends that multiple individuals who were not present for key events nonetheless provided inaccurate or uncorroborated information that was incorporated into the case narrative, while the Plaintiff's statements were not given comparable evidentiary weight or meaningfully tested against the same standards applied to other sources of information.

3. The Plaintiff contends that the evidence was not merely omitted, but affirmatively withheld from disclosure, effectively silencing information from the Plaintiff and preventing it from being considered in the case narrative.

4. Plaintiff alleges that certain witnesses provided statements that were later inconsistent or contradicted by other evidence contained in investigative or court records. Defendants Stevenson and Charney knowingly relied on or failed to correct materially misleading witness statements to support and maintain criminal charges, depriving Plaintiff of due process of law. See *Napue v. Illinois* (1959) & *Giglio V. United States* (1972).

5. Plaintiff further alleges that these inconsistencies were documented or known within the investigative record but were not meaningfully addressed in the course of the investigation or charging decision. Plaintiff alleges that the withholding of exculpatory evidence occurred during investigative and evidence-development activities outside the scope of traditional prosecutorial advocacy functions, including evidence retention decisions, investigative coordination, witness development, and management of seized materials. Buckley v Fitzsimmons established that prosecutors are not entitled to absolute immunity when they perform functions normally handled by police investigators, including: gathering evidence, developing witnesses, fabricating evidence, directing investigations before probable cause exists.It relates to the plaintiffs' case in that prosecutor Stevenson allegedly directed investigative activities, coordinated warrants, participated in evidence development,and helped shape witness classifications and investigative theories. As testified to by detective Samuel Kuaha under penalty of perjury May 2023. *See cases Burns v. Reed & Kalina v. Fletcher.*

6. Plaintiff alleges that investigative steps that could have corroborated or refuted these statements, including verification of Plaintiff's account through available records or other investigative methods, were not undertaken or were not documented.

7. Plaintiff further alleges that the resulting investigation relied primarily on selected witness statements despite the existence of contradictory or exculpatory information within the available record.

8. Detective Lendon Moss is on record as having participated in the seizure of legal materials from Morrison's cell. It has been conveyed to the plaintiff that Moss may have harbored personal animus toward the plaintiff's family arising from her late father's prior employment, during which he allegedly reported Moss for failing to take appropriate measures in an asbestos cleanup at their place of employment The Amalgamated Sugar Company. The plaintiff recalls situations where Steven Morrison, plaintiffs father, commented on Moss and the difficulties he had with him. The participation of Moss in this investigation violates police department policies that state a recusal is warranted when there is a real or perceived conflict of interest or bias. It is also referenced in Idaho Code **§ 74-403 / § 74-402.** It violates principles of ethics when individuals use police power to retaliate or target someone without legitimate investigative basis or evidence of any misconduct.

9. There was no known record or documented analysis conducted comparing the testimony of the key witnesses with the testimony of the Plaintiff.

10. Prosecutors and law enforcement did not identify, address, or analyze any alleged discrepancies, inconsistencies, or correlations between the two accounts during the investigative or charging stages of the case.

11. The discovery materials produced contain no indication that the Plaintiff's statements were ever evaluated side-by-side with Mendoza's testimony, nor do they show any investigative effort undertaken to challenge, discredit, or undermine either Zaid Mendoza or the Plaintiff before the legal materials were taken from the cell.

12. The Plaintiff alleges that only after the seizure of those protected legal materials did efforts emerge aimed at discrediting the Plaintiff and altering the narrative surrounding the case.

13. The Plaintiff further alleges that Zaid Mendoza had taken up residence at the Plaintiff's deceased father's house as soon as her father had passed from a heart attack and had not vacated despite the Plaintiff telling him that he had to leave. Plaintiffs contend that Mendoza pressured Kalob Morrison to remain at the residence by manipulation tactics related to his family not allowing him to come home due to charges of domestic battery.

14. The Plaintiff alleges that Mendoza used the Plaintiff's deceased father's house for criminal misconduct involving drugs. Records indicate failed drug tests by probation yet law enforcement continued to support Mendoza's accounts and statements.

15 The Plaintiff contends that this conduct was relevant to Mendoza's credibility, bias, and motive, but was not meaningfully investigated or disclosed.

16. The Plaintiff further alleges that Minidoka County planned to retain Plaintiff's first appointed counsel Tim Schneider for employment with the County within approximately two weeks of counsel's representation of Plaintiff, yet no meaningful effort was made to disclose, address, waive, or otherwise resolve the resulting conflict of interest concerns.

17. The Plaintiff further alleges that prosecutors and the County benefited from this conflict because Plaintiff's counsel did not adequately advise Plaintiff regarding the likelihood that the State intended to pursue charges against her, including advice concerning Plaintiff's Fifth Amendment right against self-incrimination and the potential legal consequences of providing statements or cooperation prior to being charged.

18. The Plaintiff further alleges that counsel did not inform Plaintiff of the impending employment relationship or resulting conflict concerns until approximately the day before Plaintiff was scheduled to appear in court. Plaintiff contends that the timing of this disclosure deprived

Plaintiff of a meaningful opportunity to evaluate the conflict, seek substitute counsel, make informed decisions regarding self-incrimination and cooperation with law enforcement, or otherwise protect her constitutional rights during a critical stage of the proceedings.

19. The County of Minidoka maintained policies, customs, practices, failures in supervision, or deliberate indifference that caused or permitted the constitutional violations alleged herein.

The Plaintiff alleges that Prosecutor Stevenson participated directly in investigative functions ordinarily performed by law enforcement, including coordinating warrants and investigative actions relating to attorney-client privileged legal materials.

Under *Buckley v. Fitzsimmons* and *Burns v. Reed*, prosecutors are not entitled to absolute immunity when performing investigative functions ordinarily handled by police investigators.

The Plaintiff further alleges that county officials failed to implement safeguards, training, supervision, or review mechanisms designed to prevent the seizure, review, or exploitation of attorney-client privileged materials, despite the obvious constitutional risks associated with such conduct.

The Plaintiff contends that these failures were not isolated incidents, but reflected institutional customs, practices, or deliberate indifference within Minidoka County concerning investigative coordination between prosecutors and law enforcement.

The Plaintiff further alleges that the County failed to adequately supervise or prevent prosecutorial participation in investigative conduct outside the traditional advocacy role, including conduct implicating privileged legal communications, exculpatory evidence obligations, and due process protections.

Under *Monell v. Department of Social Services,* municipalities may be held liable under § 1983 where constitutional violations result from official policy, custom, practice, failure to train, or deliberate indifference.

20. Plaintiff does not assert the constitutional rights of third parties. Rather, Plaintiff alleges that Defendants used information obtained through the seizure and review of attorney-client privileged legal materials containing references to Plaintiff, defense strategy concerning Plaintiff, and information relating to Plaintiff's legal exposure, resulting in investigative and prosecutorial actions directed at Plaintiff herself. This amounted to a sixth amendment personal injury when Defendants utilized or exploited those materials to develop investigative theories, conspiracy allegations, witness impeachment strategies, and charging decisions against Plaintiff.

21. Defendants' acquisition and use of Plaintiff's privileged legal work product and confidential litigation materials violated long-established protections recognized in *Hickman v. Taylor*, 329 U.S. 495 (1947), which protects attorney work products from improper intrusion and disclosure. Defendants further intruded upon the attorney-client relationship and utilized information obtained from Plaintiff's legal materials to pursue charges against individuals identified therein, contrary to the constitutional protections discussed in *Weatherford v. Bursey*, 429 U.S. 545 (1977). Such conduct constituted prosecutorial misconduct and violated Plaintiff's rights under the Sixth and Fourteenth Amendments to the United States Constitution

22. In a report # 2200043 MINIDOKA SHERIFFS DEPARTMENT on 01-06-2022 processed a scene and the author referred to themselves in the first person listing all the officers present but failed to provide their own Identity. They then reported they began writing Affidavits for search warrants for cell phone records. In that list was the plaintiffs name but next to a phone number that wasn't the plaintiffs. The number listed had an area code for another state and was known

by the plaintiff as belonging to Dejae Morrison. The officers that were listed and made referenced to were Detective Murphy, Detective Love, Detective Ferrero, Detective Moss, Detective Williams, Detective Potter, Detective Vincent , Detective Dudley, Detective Cobbley, Chief Kindig, Officer Sterling, and Detective Moss, and other individuals associated with probation and parole and various other specialties.

23. Plaintiff alleges that no separate affidavit for arrest warrant or independent probable cause affidavit was prepared or submitted specifically as to Plaintiff. Instead, law enforcement and/or the prosecuting authority relied upon an existing probable cause affidavit pertaining to other individuals, and extended or attributed its contents to Plaintiff without a separate individualized probable cause determination.

24. Plaintiff believes that a pattern of discovery overproduction was occurring, whereby the evidentiary record includes large volumes of minimally relevant or purely administrative materials that obscure the substantive evidence at issue. This includes, inter alia, documents relating to inmate marriage ceremonies and other institutional administrative records that were blank, unrelated communications containing images of young children, information related to what the inmate ate while incarcerated, information of his grievances, post cards with no evidentiary purpose, and stuff similar and including non-substantive cartoon imagery. Plaintiff alleges that the discovery production includes a pattern of excessive and largely cumulative materials that has the effect of obscuring potentially material exculpatory evidence, amounting to what is commonly described as "document dumping." Plaintiff further contends that this practice results in the functional burial of Brady material, constitutes cumulative and prejudicial overproduction akin to concerns addressed under Rule 403, and operates as constructive suppression or functional nondisclosure in violation of due process by impeding meaningful access to and review of relevant evidence.

24. The charges of perjury were dismissed by Judge Bollar following the preliminary proceedings where he observed that witnesses' statements contradicted one another. Rocha exhibited confusion on the events and then his statements validated plaintiffs accounts rather than Mendoza's.

Notwithstanding exculpatory testimony favorable to Plaintiff, the prosecutor continued prosecuting the matter.

25. Following Plaintiff's communication with the Federal Bureau of Investigation concerning the incident, the pending charges of Accessory to Murder were dropped within a matter of days. Plaintiff alleges that Defendants abandoned the prosecution only after federal attention was brought to the matter, as continued pursuit of charges risked revealing misconduct, unlawful investigative practices, and the knowing prosecution of an innocent person.

**IV. KUOHA AND PRESERVATION REQUESTS**

1. Detective Samuel Kuoha stated that he met with Prosecutor Stevenson on May 15, 2023.

2. Detective Kuoha further stated that on May 22, 2023, he conducted open-source research on cellular phones.

3. According to the formal request for preservation of records and other evidence under 18 U.S.C. § 2703 requested by Samuel Kuoha, Detective Bourn's sworn affidavits established the following case information: the homicide date was January 2, 2022; the approximate time was 0729 hours MST; the location was 375 South 450 West, Minidoka County, Idaho; the secondary

location was 1150 East 270 South, Lincoln County, Idaho; and the alleged perpetrators were KALOB Morrison and KLEE Morrison.

4. On May 22, 2023, open-source research was conducted regarding a telephone number associated with Nephtali Jimenez, identifying Verizon Wireless as the electronic service provider.

5. A preservation request was then prepared and served to Verizon Wireless on that date.

6. Verizon preservation requests were issued for telephone numbers associated with KALOB Morrison, KLEE Morrison, and Nephtali Jimenez.

7. The Plaintiff's cellular device was not included in those requests.

8. No investigative text or data retention requests were directed toward the Plaintiff's phone in the initial investigation.

9. Samuel Kuoha stated in that request that, "I have not included every fact known to me concerning this investigation."

10. The Plaintiff believes that this is evidence that investigators were aware there were other players in this case that they did not conduct investigative measures into.

11. The Plaintiff further alleges that investigators did not pursue retention of the Plaintiff's information despite having the same cellular carrier.

**V. SEIZURE OF LEGAL MATERIALS**

1. Following the seizure of attorney-client privileged materials from her brother Klee Morrisons cell by Detectives Moss and Bourne, acting under the direction of Prosecutor Stevenson November 10 2022 detectives used a confidential informant to try to implicate plaintiff in alleged crime.

2. The Plaintiff further alleges that no charges or inculpatory evidence resulted from the forensic examination of plaintiffs phone. Additionally no recorded forensic evidence was attributed to the plaintiff.

3. The Plaintiff also alleges that conspiracy charges were not filed until after the seizure of attorney-client privileged materials which resulted in the change of prosecutor from Stevenson to Charney by order of the court because Stevenson was no longer able to prosecute the defendants. Klee Morrison told the plaintiff on May 12, 2026 that law enforcement wanted his legal paperwork because it contained information on law enforcement illegal investigation tactics and 'everything that they had been doing'.

4. The Plaintiff contends that Prosecutor Charney expressed concern at certain points that the suspects specifically Kalob Morrison might be acquitted due to alleged constitutional violations and evidentiary issues.

5. Shortly after law enforcement seized plaintiffs phone, plaintiffs ex husband Amp May received pictures of decapitated men, women and children. The bodies were strung about on the floor with male appandages shoved inside the mouths of the victims. Included in the pictures were listed names of known family members as if to demonstrate that someone was searching for plaintiffs relatives. May submitted the information to law enforcement and they reported that they found the photos had come from a burner phone located in Nevada.

6. Plaintiff informed law enforcement that any discussion would need to be in front of plaintiffs legal counsel but they routinely sent individuals to try to speak to the plaintiff. On one such occasion two non-uniformed individuals came and were asked to leave. On another occasion they sent officer Brad Mecham, an officer who the plaintiff was on familiar terms with in the community. He asked the plaintiff where she had obtained her phone because the detectives had informed him it contained pornography. There was no explanation as to what content it was

or how it equated to illegal activity. Plaintiff feared that law enforcement was attempting to intimidate her with false claims of illicit material or illegal activity to force cooperation and discussions without the presence of a lawyer.

6. At some point thereafter, Stevenson was removed from the case for actions involving the taking of attorney client privilege paperwork and other activities. It was also brought into question his awareness or the other officers involvement in fabricating evidence locker logs that did not match digital transcripts that had been recorded. At that time Stevenson was replaced by Prosecutor Dennis Charney.

7. Following this transition, Prosecutor Charney filed conspiracy charges against the Plaintiff and charges of perjury.

8. The Plaintiff contends that these charges were not supported by physical evidence substantiating the allegation of accessory.

9. The Plaintiff also alleges that law enforcement and the prosecution repeatedly declined to release the Plaintiff's cellular device during the course of the investigation and prosecution, and that, as of May 18, 2026, the device remains in law enforcement possession. Charney without lawful justification continued to retain the phone after its evidentiary purpose had been satisfied, in violation of the Fourth and Fourteenth Amendments.

10. The Plaintiff asserts that this conduct was intended to prevent disclosure of potentially exculpatory information and material that could contradict the testimony of Zaid Mendoza or validate the Plaintiff's version of events.

## VI. CHARNNEY STATEMENTS AND PHONE RETENTION

1. The Plaintiff alleges that during court proceedings in April 2026, in connection with Klee's trial, Prosecutor Dennis Charney acknowledged that photographic evidence obtained from the Plaintiff's cellular device corroborated aspects of the Plaintiff's account.

2. The Plaintiff further alleges that Charney testified in hearings pertinent to Klee Morrisons trial, that "nobody was saying" the Plaintiff had committed the underlying acts in question, and that no one was accusing her of direct participation in those acts.

3. The Plaintiff contends that Charney's comments raise the question whether he was speaking only for himself or for law enforcement and the prior prosecution.

4. The Plaintiff further alleges that Charney stated the purpose of dismissing charges against the Plaintiff was instead to utilize the plaintiff as a witness.

5. The Plaintiff also alleges that Charney indicated at the hearing for consideration to squash the subpoena, that he was unaware as to why the prior prosecution did not utilize information found in the photographic evidence that was withheld.

6. The Plaintiff contends that these statements reflect an effort by the current prosecution to distance itself from the decisions and actions of the prior prosecution, including the filing and continuation of charges that the Plaintiff alleges were not supported by sufficient evidence.

7. The Plaintiff further alleges that there was intentional bias within the investigation and prosecution to disregard the Plaintiff's statements and to avoid conducting any meaningful investigation into their truthfulness.

8. The Plaintiff contends that her testimony was not independently verified, tested for accuracy, or meaningfully compared against other witness accounts in a neutral manner.

9. The Plaintiff alleges that Prosecutor Dennis Charney denied or withheld exculpatory evidence on multiple dates, including evidence obtained from the Plaintiff's cellular device and other materials corroborating the Plaintiff's account.

10. The Plaintiff alleges that photographic evidence obtained from her cellular device corroborated aspects of her version of events, yet that evidence was not timely released to the Plaintiff or her counsel.

11. The Plaintiff further alleges that Prosecutor Charney continued to withhold or refuse to release the Plaintiff's cellular device even after the evidence from that device had been reviewed and was relevant to the Plaintiff's defense.

12. The Plaintiff alleges that Tim Schneider plaintiffs first Counsel stated that Prosecutor Charney would not release the phone from evidence, but if she cooperated she might get probation. which the Plaintiff contends reflects ongoing suppression of material evidence intimidation and improper influence.

13. The Plaintiff further alleges that David Steward, Plaintiff, second court appointed public defender, related to her that Charney was uncooperative with him and again denied releasing plaintiffs phone. Plaintiff's counsel failed to inform plaintiff the council intended to withdraw on the basis of alleged conflict of interest. Plaintiffs first learned of counsel's withdrawal from the Court during subsequent status hearings. In following text messages counsel related his decision to withdraw was based on statements from Matt Keen who he said represented a snitch who was a cell mate to Kalob Morrison. Matt Keen disclosed to counsel that he implicated Klairessa knowing about the murder. Keen asserted they knew Plaintiff was lying thereby prejudicing Plaintiff's credibility in creating an actual conflict between counsel's duty of loyalty and the views of his coworkers. Plaintiff later learned of these statements which suggested a broader concerted effort among all involved in the matter to implicate plaintiff in the alleged crime. Plaintiff alleges that Council's bias against plaintiff was so pronounced that in an email to

Shannon Romero regarding alternative counsel dated Oct 29, 2024 it was stated that plaintiff wished to plead guilty rather than not guilty.

14. The Plaintiff alleges that law enforcement and the prosecution refused to release the Plaintiff's cellular phone to plaintiff's third court appointed public defender, Clayne Zollinger despite requests for its return or disclosure.

15. The Plaintiff alleges that additional exculpatory evidence remains in Defendants' possession, custody, or control and has not yet been produced. Plaintiff also notes that law enforcement retained pictures of minors in evidence as well as communications with friends and family members. Plaintiff further moves the Court, in the alternative, for an order requiring the return or destruction of any non-essential copies of photographs depicting minors, or any materials not necessary for continued evidentiary purposes, to prevent further dissemination and to protect the privacy and welfare of the minors.

16. The Plaintiff further alleges that more evidence of this type is likely to be retained in discovery, including internal emails, communications, investigative notes, and records concerning the decision not to release the Plaintiff's phone and other exculpatory material. The paperwork regarding plaintiffs' late fathers estate was also retained as evidence yet no valid reason was listed.

17. Charney contacted the plaintiff looking for the phone number for Amp May, the plaintiff's ex-husband via text. According to May, the purpose in contacting May was related to discussions with law enforcement concerning May's clothing, particularly because Carlos Rocha later testified that the plaintiff had provided her brother's clothing after the alleged crime, despite Rocha never previously mentioning that allegation. The plaintiff asserts this sequence of events

suggests Rocha was being coached or supplied with information intended to implicate the plaintiff.

18. The plaintiff acknowledges that the contact may have been undertaken in the prosecutor's administrative or organizational capacity. However, the plaintiff contends that the circumstances nevertheless raise questions as to why Prosecutor Charney was personally engaging in activities typically performed by law enforcement or detectives, including tracking down information and obtaining contact details related to witnesses and investigative matters. The plaintiff argues that such conduct is consistent with an investigative role rather than a purely prosecutorial function.

## VII. WITNESS STATEMENTS

1. The Plaintiff alleges that during Detective Samuel Kuoha's testimony, he indicated that certain investigative measures were intentionally not disclosed in order to avoid alerting or "tipping off" the defendants during the course of the investigation.

2. The Plaintiff understands this to reflect a law enforcement practice of limiting disclosure of active investigative techniques at the time of their use.

3. The Plaintiff further alleges that, due to the Court's requirement that additional supporting information be submitted, there is a concern that further disclosure of investigative details may provide law enforcement and the prosecution with notice of the specific evidence being sought.

4. The Plaintiff contends that such notice could create a risk of alteration, suppression, or destruction of relevant evidence, whether intentional or otherwise.

5. The Plaintiff further alleges that such withholding of evidence and failure to disclose potentially exculpatory material is inconsistent with the due process requirements established in Brady v. Maryland.

6. A witness to Kalob's arrest told plaintiff, "There was Kalob z and that dude stormee came flying through the door kicked Kalob and woke him up and said I need to talk to you now hurry hurry he was half asleep and she said in my office now which I assume was her vehicle she ran out he ran after her then the cops came busting in like 30 seconds later". Plaintiff alleges that this contradicts officer Bourne's sworn statement on January 15, 2022 where he stated " it was later determined through investigation that upon seeing law-enforcement Kalob hid a cellular phone and a firearm in the backseat area of the truck".

7. Stormee Russel made statements regarding the plaintiff that were not substantiated or investigated by law enforcement. Plaintiff has reason to believe because of Russel's own criminal history and pending cases she was utilized by law enforcement in the accusation of the crime and in apprehension of Kalob Morrison.

8. Plaintiff alleges that Russell had ill intent towards the plaintiff for not allowing her to provide a sample of her hair so that Russell could pass a drug screening.

9. Plaintiff asserts that Russell's ill intent was directed towards plaintiff from an incident where Russell assaulted Aislen Morrison resulting in damages to her face and that Russell refused to leave the premises in all but one occasion where plaintiff threatened to call law enforcement.

10. Plaintiff notes that none of this was investigated by law enforcement including Stormee Russell's involvement in criminal behavior or her relationship to Julio Lopez and her personal relationship to Mercedez Sanchez and her reference to Russell as her love.

11. Plaintiff also notes that Russell was not required to testify at Kalob Morrison's trial and the reason given was that she falsely claimed to have swallowed batteries.

12. There was no mention as to why she was not called to testify in Klee Morrison's trial.

13. Before passing away August 2021 Steven Morrison related to the plaintiff that he informed law enforcement to arrest anyone that came to his residence. Morrison's statements to law enforcement regarding arresting any individuals who came to his residence are not fully documented in the available record, and discovery and police records will be necessary to identify the responding officers and substantiate the content of those communications and what events were placed in motion because of them.

14. According to Lendon Moss in sworn testimony November 9, 2022 pings from Lopez ankle monitor showed the arrival time of 7:09 and leaving at 7:20. Plaintiff notes that the time mentioned is eleven minutes. That time frame is not consistent with Mendoza's testimony of events or his changed testimony of events.

15. On January 9, 2022 detective Williams interviewed Aislen Morrison and reported that on 1/2/22 Kalob and Ziad were out in the shop around noon. This is in direct conflict with Zaid's testimony that he was in bed. She also reported that the plaintiff came to Klees because she was going to visit her boyfriend in Mesa, Arizona. Despite the witness providing testimony that blatantly conflicted with the accounts of other witnesses, Defendants failed to conduct adequate investigative steps to corroborate the competing statements or meaningfully examine the discrepancies.

16. Plaintiff alleges that investigators failed to meaningfully evaluate contradictory witness statements or assess witness credibility prior to pursuing charges, and that prosecuting authorities nevertheless continued the prosecution despite unresolved inconsistencies and insufficiently corroborated allegations.

**VIII. TESTIMONY**

1. Fierro indicated in her report that she interviewed Carlos Rocha, who was incarcerated with KALOB, on December 8, 2022.

2. Fierro's report indicated that Rocha told her that KALOB told him that Renz was at his residence soon after Lopez's death.

3. Rocha told Fierro that KALOB told Renz to leave because "something bad" had happened at the residence.

4. Rocha also told Fierro that KALOB had been trying to filter letters through him to Osterhout.

**IX. ROCHA STATEMENT CONCERNS**

1. At no point during the initial investigation was the Plaintiff's name identified by investigators as being involved in the alleged crime, nor was the Plaintiff referenced by investigating officers in the reports initially disclosed.

2. The Plaintiff alleges that only after the seizure of attorney-client paperwork did documentation suddenly appear that was purportedly attributed to Carlos Rocha alleging the Plaintiff's involvement.

3. The Plaintiff further alleges that the handwritten statement attributed to Carlos Rocha is highly suspect and lacks basic indicia of reliability and authenticity.

4. Specifically, the document does not appear to be in Carlos Rocha's handwriting, was not signed by Rocha, does not identify the officer who allegedly conducted the interview, and appears incomplete, as only a page identified as "page three" was produced for discovery while preceding pages are missing.

5. Additionally, the records fail to identify who obtained the statement, and no accompanying audio or video recording of the interview was disclosed to verify the authenticity, accuracy, or context of the alleged statement.

6. According to Samuel Kuoha's testimony recorded on June 21, 2023, Fierro indicated in her report that she interviewed Carlos Rocha, who was incarcerated with KALOB, on December 8, 2022,

7. and that Rocha also told Fierro that KALOB told him that Osterhout had assisted in disposing Lopez's body.

8. The Plaintiff further notes that, despite these allegations, no information connected the Plaintiff to the alleged conduct, nor was the Plaintiff identified in relation to Osterhout or the claims being made by Rocha.

9. According to statements attributed to Fierro, KALOB was attempting to route letters to Gary Osterhout through Carlos Rocha.

10. The Plaintiff alleges that this information should have prompted significant investigative attention, including verification of correspondence patterns, custodial communication monitoring, and independent corroboration of Rocha's role in facilitating communications.

11. However, the Plaintiff contends that this lead was treated with blatant disregard and that Detective Moss sought verification of the reaction of the defendant.

12. The Plaintiff further alleges that this same communication pathway was later repurposed as part of an effort to implicate the Plaintiff in the underlying criminal allegations.

13. Specifically, the Plaintiff contends that Carlos Rocha later provided statements in which similar allegations regarding the routing or filtering of communications were used, but this time directed at implicating the Plaintiff rather than Gary Osterhout.

14. The Plaintiff alleges that this shift demonstrates a pattern in which Rocha's statements were selectively framed or utilized in a manner consistent with the prosecution's evolving theory of the case, rather than being subjected to consistent investigative scrutiny or independent verification.

15. References and inferences should be made concerning the Gilbert Rodriquez murder case in which the testimony of Carlos Rocha was given.

**X. PREMEDITATION AND INFORMANT DEVELOPMENT**

1. Fierro states in her report that she interviewed Carlos Rocha, who had been incarcerated with Kalob, on December 8, 2022.

2. The Plaintiff alleges that the inclusion of this fact demonstrates premeditation and coordination involving Carlos Rocha prior to the events at issue.

3. The Plaintiff further contends that there was no apparent investigative reason to reference Rocha's prior incarceration with Kalob Morrison, as that information fell outside the scope of the incident being investigated and was unrelated to the substance of Rocha's statements.

4. The Plaintiff believes the December 8, 2022 date reflects that law enforcement had established a relationship with Rocha before Julio Lopez was released from custody on December 29, 2021.

5. At that time, according to the Plaintiff, no crime had yet been committed.

6. The Plaintiff therefore alleges that law enforcement intended to utilize Julio Lopez as an agent provocateur and instigator.

7. Julio Lopez was incarcerated on weapons violation charges, and a restraining order had reportedly been obtained against him by his girlfriend, Mercedes Sanchez. In an incident report by the Heyburn police department dated 9/14/2023 law enforcement recorded that Mercedes wasn't at home and Mercedes said this was for her safety so Julio could not hurt her. In that same incident report the neighbor Angela Benavides reported Julio had threatened her and her husband in the past with firearms and she feared for her safety. She reported she looked out her window and saw a grey dodge pickup that she knows Julio drives. She then observed him holding a rifle and driving around the house multiple times. Subsequent investigations were done by detective Bourne on a grey dodge pickup that he added plaintiffs name to. but there was no mention of Lopez's vehicle fitting that same description.

8. In Officer Bourne's Affidavit of Probable Cause in support of a Warrant, dated January 18, 2022, it states from " I reviewed through the jail phone calls from Julio when he was incarcerated at the Mini-Cassia Jail. During the dates of December 15 to December 18th, there are approximately eight phone calls where Julio attempts to contact the phone number ending in 9716 which is Kalob Morrison's phone number."

9. Plaintiff alleges that law enforcement officials were aware of Lopez's violent tendencies and dangerous propensities, as well as his continued fixation on Kalob Morrison, as evidenced by recorded jail calls in which Lopez repeatedly attempted to contact Morrison despite the circumstances surrounding his incarceration and existing criminal allegations.

10. According to the Plaintiff, this supports the inference that Kalob Morrison was the intended target of Julio Lopez.

11. The Plaintiff alleges that Fierro's report documents Carlos Rocha as already attempting to establish a relationship with Kalob before Julio Lopez was released from incarceration on December 29, 2021.

12. According to the Plaintiff, this supports the inference that Rocha had already been identified, cultivated, or positioned as a cooperating witness or jailhouse informant before any alleged crime had occurred.

13. The Plaintiff further alleges that Julio Lopez was subsequently utilized as an instigator or agent provocateur directed toward Kalob Morrison while incarcerated with Carlos Rocha.

14. The Plaintiff contends that these actions were not merely passive investigative efforts, but part of a coordinated effort to create opportunities for criminal conduct and develop testimony or evidence against a preselected target. Referenced cases *Sorrells v. United States* regarding entrapment & *Jacobson v. United States.*

15. The Plaintiff also suspects that Zaid Mendoza may have been involved in providing information to law enforcement regarding other individuals as well as collaboration with officers. As reflected in evidence that was discussed in Kalob Morrison trial. And the subsequent lack of criminal charges related to the alleged crime.

16. The Plaintiff contends that these interactions show Mendoza repeatedly pressured Kalob Morrison to communicate with Julio Lopez despite Morrison's expressed unwillingness to do so.

17. The Plaintiff further alleges that this context also aligns with the apparent lack of scrutiny given to Zaid Mendoza's repeated changes in his statements.

18. The Plaintiff asserts that, instead of reconciling or investigating these inconsistencies, a narrative was advanced that was inconsistent with the Plaintiff's account that Mendoza was present at her residence on the relevant dates.

19. The Plaintiff alleges that no recorded interviews or documented follow-up questioning were conducted with Zaid Mendoza regarding Julio Lopez's frequent visits to Kalob Morrison's residence, nor regarding Mendoza's alleged role in encouraging or pressuring communication between Morrison and Lopez.

20. The Plaintiff further alleges that Zaid Mendoza had taken up residence at the Plaintiff's deceased father's house as soon as her father had passed from a heart attack and had not vacated despite the Plaintiff telling him that he had to leave.

21. The Plaintiff alleges that Mendoza used the Plaintiff's deceased father's house for criminal misconduct involving drugs.

22. The Plaintiff asserts that this lack of inquiry reflects a failure to investigate material issues relevant to witness credibility and the reliability of Mendoza's statements.

23. Plaintiff has been made aware, through discovery and review of case materials, of more than twenty-one pages of reported discrepancies, of the testimony of Zaid Mendoza and Carlos Rocha including multiple instances in which witness accounts changed or were inconsistent across hearings and trial proceedings.

24. Lendon Moss reported that he interviewed Carlos Rocha in the presence of Rocha attorney Justin McCarthy on September 30, 2022. On that date he recorded that he asked Rocha how Kalob Morrison reacted when he found out his letter to Mason Day was intercepted by law enforcement. The plaintiff alleges that law enforcement was not only aware of letters but they were monitoring Kalob's reactions and wanted Rocha to continue to encourage Morrison to write

letters to try to implicate the plaintiff. Plaintiff notes that the validity of these letters is still in question and by whose hand they were written. No investigative information in discovery shows hand writing analysis, finger prints, or the transmission. Plaintiff also notes that there is no audio or video recording of these interactions and is purely recorded in writing from the interpretations of Lendon Moss.

25. Within the evidence retained by law enforcement was letters addressed to Kalob Morrison's lawyer Allen Browning. In the contents were assertions that the plaintiff knew nothing of activities pertaining to events listed.

26. Plaintiff alleges that the written communications at issue were addressed to legal counsel, as evidenced by the mailing address and identifying information contained on the correspondence. Plaintiff further alleges that such communications were intended to be confidential and related to legal representation.

In the alternative, even if Defendants contend that the communications were not privileged attorney-client correspondence, law enforcement personnel nevertheless had knowledge of the existence and contents of those communications, retained them within the evidentiary record, and subsequently relied upon or utilized the contents therein to implicate Plaintiff through the influence of of Carlos Rocha on Kalob Morrison.

## XI. INVESTIGATIVE ROLE OF STEVENSON

1. According to the information submitted by Kuoha, Prosecutor Lance Stevenson was acting in an investigative capacity rather than solely performing traditional prosecutorial advocacy functions.
2. Kuoha stated that Stevenson identified certain individuals as witnesses rather than suspects, provided search warrant affidavits to establish the basis for obtaining additional warrants, and requested Kuoha's assistance specifically because of his training and experience in mobile device technology to determine the locations of witnesses during the relevant time period.
3. Kuoha further stated that Stevenson directed him to review investigative materials and assist in obtaining warrants.
4. The Plaintiff alleges that these actions demonstrate Stevenson's direct participation in investigative activities typically performed by law enforcement personnel, including evidence development, witness-location analysis, and coordination of investigative warrants.
5. The Plaintiff alleges that such conduct falls outside the traditional advocacy functions associated with judicial proceedings and instead constitutes investigative conduct under Burns v. Reed, 500 U.S. 478 (1991), and *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993).
6. The Plaintiff further alleges that prosecutors are not entitled to absolute immunity when performing functions normally associated with police investigators, including gathering evidence, directing investigative activity, developing witness information, and assisting in warrant preparation prior to the establishment of probable cause.
7. To the extent Stevenson personally vouched for factual assertions, participated in sworn factual submissions, or directed investigative representations presented to the court,

Plaintiff alleges such conduct falls outside protected advocacy functions under *Kalina v. Fletcher*, 522 U.S. 118 (1997).

8. Plaintiff therefore alleges that Stevenson is entitled, at most, to qualified immunity for these investigative actions rather than absolute prosecutorial immunity.
9. The plaintiff asserts that Prosecutor Stevenson's role after charges were filed against plaintiff remains ambiguous. At this stage, the precise scope of Stevenson's involvement remains unknown, and the plaintiff contends that discovery is necessary. Although Stevenson was not the attorney directly prosecuting the plaintiff, he allegedly continued engaging in activities connected to the investigation and case development, suggesting involvement beyond the traditional role of an advocate.

10. May 15, 2023 according to reports, detective Kuoha received a call from prosecutor Stevenson that he conduct a follow up on the Morrison case. Plaintiff would like to note that it wasn't referred to as the murder case of Julio Lopez but the Morrison case.

11. In the report recorded May 23, 2023 detective Kuoha was informed by Stevenson's

staff that he had to get reports directly from detective Bourne who is the case officer. Kuaha reported that he told Bourn he would not speak to him about the case but just wanted the case reports. Plaintiff alleges that Bourne was the case officer in name only and Prosecutor Stevenson was the one directing the investigation and determining what information was given to Bourne. Plaintiff alleges that this brings into question whether the request lacked proper investigative basis, whether information was being compartmentalized, if he was assigned a separate task or sub-investigation, whether the request lacked proper investigative basis, or the detective was acting outside normal procedure.

## XII. WARRANT INCONSISTENCIES

1. Samuel Kuoha wrote that on May 15, 2023, he met with Prosecutor Stevenson.

2. Stevenson requested his assistance in preparing and obtaining search warrants for call detail records for the phone numbers belonging to Nephtali Jimenez, Israel Robles, Troy Anderson, Larry Osterhout, and Nathan Renz.

3. Stevenson stated that Jimenez, Robles, Anderson, Osterhout, and Renz were witnesses in the homicide of Julio Lopez and not suspects.

4. Stevenson gave Kuoha copies of search warrant affidavits and requested his assistance due to his experience and training in mobile device technology to determine the location of the witnesses during the suspected time of the incident.

5. According to this information submitted by Kuoha, Lance Stevenson was acting in an investigative capacity.

6. The Plaintiff further alleges that the State's filings and warrant materials contain material inconsistencies regarding the identity of the target telephone number and the basis for probable cause.

7. In a certified statement, Samuel Kuoha represented that the request concerned Troy Anderson's phone number ending in 2776.

8. However, prosecutorial filings submitted by Lance Stevenson, Robert S. Hemsley, Allen Goodman, and John J. Smith requested information for a different number ending in 8545, identified as belonging to Israel Robles.

9. This discrepancy raises substantial questions regarding whether the State omitted or misrepresented material facts to the court, including the role of Israel Robles and Troy Anderson.

10. The Plaintiff alleges that it was suspect that the prosecutors specifically requested administrative account information from an account ending in
0025, associated with Nephtali Jimenez.

11. Plaintiff further alleges that material inconsistencies regarding the target telephone numbers, investigative purpose, and identity of witnesses or informants were omitted or misrepresented in submissions presented to the court.

12. Plaintiff alleges that omissions and inconsistencies of material fact in warrant-related representations implicate the due process principles recognized in *Franks v. Delaware*, 438 U.S. 154 (1978), including the prohibition against material falsehoods or reckless omissions in warrant applications.

13. Plaintiff further alleges that suppression or nondisclosure of impeachment evidence, informant activity, inducement conduct, or exculpatory evidence implicates *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959).

---

## XIII. CLAIMS FOR RELIEF

1. Plaintiff alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.
2. At all relevant times, Defendants acted under color of state law and deprived Plaintiff of rights secured by the Constitution and laws of the United States, including rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments.
3. Plaintiff alleges that Defendants suppressed, withheld, delayed disclosure of, or failed to preserve exculpatory and impeachment evidence material to Plaintiff's defense and liberty interests, in violation of due process principles recognized in Brady v. Maryland, 373 U.S. 83 (1963), and related authority.
4. Plaintiff further alleges that Defendants relied upon, encouraged, presented, or failed to adequately verify misleading, inconsistent, unreliable, or fabricated witness information, including information obtained through confidential informants and cooperating witnesses, in violation of due process protections recognized in Napue v. Illinois, 360 U.S. 264 (1959), and related authority.
5. Plaintiff alleges that Defendants knowingly, recklessly, or intentionally used investigative techniques designed to manufacture, induce, or improperly attribute criminal conduct to Plaintiff without adequate evidentiary support.
6. Plaintiff further alleges that Defendants selectively credited inculpatory information while disregarding, minimizing, concealing, or failing to investigate exculpatory information favorable to Plaintiff.
7. Plaintiff alleges that Defendants improperly obtained, retained, reviewed, copied, withheld, or exploited legal papers, legal research, confidential legal materials, and defense-related documents for investigative or prosecutorial purposes.

8. Plaintiff further alleges that such conduct interfered with Plaintiff's ability to prepare a defense, access the courts, communicate confidentially regarding legal matters, and receive fundamentally fair proceedings as guaranteed by the Constitution.
9. Plaintiff alleges that Defendants engaged in investigative and prosecutorial conduct that was malicious, deceptive, retaliatory, reckless, and intended to secure, sustain, or justify criminal charges without sufficient reliable evidence.
10. Plaintiff further alleges that investigative delay, retention of evidence, and failure to timely disclose favorable information caused substantial prejudice and violated due process principles recognized in United States v. Lovasco, 431 U.S. 783 (1977).
11. Plaintiff alleges that certain actions undertaken by prosecutorial Defendants were investigative or administrative in nature rather than advocative functions intimately associated with the judicial phase of prosecution, and therefore are not protected by absolute prosecutorial immunity under Burns v. Reed, 500 U.S. 478 (1991), Buckley v. Fitzsimmons, 509 U.S. 259 (1993), and Kalina v. Fletcher, 522 U.S. 118 (1997).
12. Plaintiff further alleges that Defendants' conduct deprived Plaintiff of liberty, due process of law, access to exculpatory evidence, meaningful access to the courts, a fair investigation, and fundamentally fair proceedings under the Constitution and laws of the United States.

13. Plaintiff alleges that individuals associated with the Public Defender's Office, together with investigative and prosecutorial personnel, participated in coordinated conduct that contributed to the development, reinforcement, and promotion of a misleading and prejudicial narrative portraying Plaintiff as guilty despite the existence of exculpatory information and insufficient reliable evidentiary support.

Plaintiff further alleges that Defendants and associated actors disclosed, relied upon, exchanged, manipulated, or selectively utilized information connected to Plaintiff's legal

representation, defense preparation, and related communications in a manner that undermined Plaintiff's constitutional rights to fair proceedings, due process of law, meaningful legal representation, and access to exculpatory information.

To the extent such conduct was undertaken jointly or cooperatively between defense-related personnel and state actors, Plaintiff alleges that such actions constituted concerted activity contributing to the deprivation of Plaintiff's constitutional rights under color of state law.

14. Plaintiff further alleges that such conduct exceeded the legitimate scope of defense representation and compromised Plaintiff's constitutional rights to confidential legal representation, fair proceedings, due process of law, and effective assistance of counsel

15. To the extent such actions were undertaken jointly, cooperatively, or conspiratorially with prosecutorial, investigative, or other state actors, Plaintiff alleges that such conduct constituted action under color of state law within the meaning of 42 U.S.C. § 1983, including under the principles recognized in Tower v. Glover, 467 U.S. 914 (1984).

16. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of liberty, emotional distress, reputational harm, legal prejudice, financial damages, and other injuries to be proven at trial.

## XIV. DAMAGES

1. As a direct and proximate result of Defendants' conduct, Plaintiff suffered deprivation of liberty, emotional distress, reputational injury, financial losses, interference with familial relationships, and violation of constitutional rights secured by the Fourth, Fifth, Sixth, and Fourteenth Amendments.

2. Plaintiff suffered emotional distress, humiliation, anxiety, depression, fear, loss of sleep, reputational harm, and mental anguish resulting from the investigation, prosecution, incarceration, public allegations, and deprivation of due process. While incarcerated Plaintiff was intentionally targeted and denied access to essential toiletries and basic hygiene items and showers and was further subjected to deliberate indifference through intentional disregard and refusal to respond to Plaintiffs requests and needs.

3 .Plaintiff suffered economic damages including:

- loss of employment and employment opportunities;
- loss of earning capacity;
- inability to continue employment requiring federal clearance;
- bail-related financial obligations;
- high-interest debt incurred to secure release;
- litigation-related costs;
- and other consequential financial losses according to proof.

4. Plaintiff further suffered damages arising from prolonged retention of personal property, including her cellular device and legal materials, and from the inability to access potentially exculpatory evidence.

5. Plaintiff's familial relationships and parental role were substantially harmed. Plaintiff's children suffered emotional distress and instability during Plaintiff's prosecution and incarceration, including mental health impacts requiring treatment and diagnosis.

6. Plaintiff's reputation and community standing were harmed.

7. Plaintiff was unable to secure stable employment, where in prior positions plaintiff had federal clearance, one example working in finance where plaintiff held positions as a personal banker. Plaintiffs Insurance license was not able to be renewed because of allegations of perjury. Plaintiff's independent sale of insurance products was reprehensibly damaged.

8. Plaintiff alleges that bail was set at an unusually high amount and remained in place throughout the proceedings, despite the absence of individualized findings demonstrating that Plaintiff posed a flight risk or a danger to the community. Plaintiff further alleges that she was incarcerated during these proceedings and was required to appear remotely via video conferencing without counsel present, which impaired her ability to meaningfully challenge bail conditions or respond to representations made to the court.

9. Plaintiff says prosecutors had access to her personal financial information from her electronic device.

10. Plaintiff secured bail through a credit card with high interest. Plaintiff alleges that the imposition and enforcement of bail conditions resulted in financial obligations that materially increased plaintiffs debt to income ratio thereby exceeding underwriting thresholds and effectively preventing plaintiff from obtaining additional credit or borrowing against plaintiffs home equity.

11. Plaintiff alleges that she was unable to refinance or transfer the credit card debt incurred as a result of her bail conditions. Plaintiff further alleges that financial institutions indicated that changes in her employment industry and income structure affected eligibility for refinancing. Plaintiff contends that such changes were not voluntary, but resulted from her inability to

continue working in the insurance industry due to the pending criminal charges. Plaintiff further alleges that, after approximately eight months, she experienced additional financial instability when her only available employment was seasonal in nature and she was subsequently laid off, further impairing her ability to manage or restructure the debt.

12. Plaintiff alleges that she obtained her bail through a licensed bail bondsman and that the bondsman subsequently communicated to the co-signer on Plaintiff's bond that Plaintiff was not making required payments, which Plaintiff contends was inaccurate. Plaintiff further alleges that, when she addressed this with the bondsman, the bondsman made statements minimizing or misrepresenting the payment expectations previously agreed upon.

Plaintiff alleges that, as a result of these communications and her concern that the bondsman might report alleged nonpayment to the Court, she took steps to pay off the bond in full to avoid the risk of revocation or rearrest.

Plaintiff further alleges that the bondsman Sonya Bailbonds was later indicted by Minidoka County in connection with conduct related to bail bond activities. Plaintiff alleges that she inquired whether her own case would be reviewed in connection with that investigation and was informed that they were only reviewing cases specifically requested by the County for investigation. Plaintiff contends that this response raised concerns regarding inconsistent enforcement or selective review of bail-related misconduct and fraud.

13. Plaintiff alleges that requests to law enforcement for information and records were largely unanswered or not timely addressed. Plaintiff further alleges that responses were provided only after she notified Defendants of the applicable statutory response requirements and deadlines, including the obligation to respond within the prescribed time period, after which non-response would be treated as a denial under applicable public records law.

14. Minidoka County responded to a records request with a demand that in order to access the information Plaintiff was required to sign a statement that information wouldn't be used against them in court.

15. Due to the death of her parents and the incarceration of other immediate family members,her remaining primary support was a sister-in-law as her primary who was not involved in the underlying case. Plaintiff further alleges that a protective order was obtained by the prosecutor Charney against that individual, which had the effect of restricting Plaintiff's ability to communicate during the pendency of the case.

Plaintiff alleges that Defendants acted intentionally, maliciously, recklessly, and with deliberate indifference to Plaintiff's constitutional rights, thereby entitling Plaintiff to punitive damages against the individual Defendants.

Plaintiff presently estimates compensatory damages in an amount to be determined at trial, but reasonably believed to exceed $5,000,000, exclusive of punitive damages, attorney fees, costs, and interest.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendants as follows:

1. Declare that Defendants violated Plaintiff's constitutional rights.
2. Award compensatory damages according to proof.
3. Award punitive damages where permitted by law.
4. Award costs and any attorney's fees allowed by law.
5. Grant such other and further relief as the Court deems just and proper.

JURY TRIAL DEMANDED

Dated: May 19, 2026

Respectfully submitted,

— [signature]

Klairessa May, Plaintiff

20560 N Main Street

208-312-8715